Hmg12.12.23  Case 1:23-cr-00462-MJM   Document 10   Filed 01/08/24   Page 1 of 13

✓ FILED    ___ ENTERED
___ LOGGED    ___ RECEIVED

12:06 pm, Jan 08 2024
AT  BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____Deputy

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Northern Division*

Sean R. Delaney
Assistant United States Attorney
Sean.Delaney@usdoj.gov

Mailing Address:
36 S. Charles Street, 4th Floor
Baltimore, MD 21201

Office Location:
36 S. Charles Street, 4th Floor
Baltimore, MD 21201

DIRECT: 410-209-4913
MAIN: 410-209-4800
FAX: 410-962-3091

January 8, 2024

Andrew Alperstein, Esq.
201 N. Charles Street, Suite 2000
Baltimore, Maryland 21201

      Re:    United States v. Alexander Jacob Schultz
               Criminal No. [to be assigned] MJM-23-0462

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Alex Schultz (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office").  If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. **If this offer has not been accepted by January 8, 2024 it will be deemed withdrawn.** The terms of the Agreement are as follows:

Offense(s) of Conviction

      1.      The Defendant agrees to plead guilty to Count One of an Information, which will charge the Defendant with Conspiracy to Commit Bank Fraud, in violation of 18 U.S.C. § 1349. The Defendant admits that the Defendant is, in fact, guilty of the offense and will so advise the Court.

Elements of the Offense(s)

      2.      The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:  That on or about the time alleged in the Information, in the District of Maryland:

Elements of Conspiracy to Commit Bank Fraud:

    a. The Defendant and at least one other person entered into an unlawful agreement;

    b. The purpose of the agreement was to knowingly execute or attempt to execute a scheme and artifice to defraud a financial institution insured by the Federal Deposit Insurance Corporation by means of materially false and fraudulent pretenses, representations, and promises, as charted in the Information;

c. The Defendant knowingly and willfully became a member of the conspiracy.

Penalties

3. The maximum penalties provided by statute for the offense(s) to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 1349 | N/A | 30 years | 5 years | $1 million or twice gross gain/loss | $100 |

a. Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b. Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

c. Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

d. Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

e. Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

f. Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant

agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

## Waiver of Rights

4. The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

    a. If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

    b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

    c. If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

    d. The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

    e. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

    f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

    g. If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

    h. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

<u>Advisory Sentencing Guidelines Apply</u>

 5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

<u>Factual and Advisory Guidelines Stipulation</u>

 6. This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein. This Office and the Defendant further agree that:

**Conspiracy to Commit Bank Fraud:**

    a. The applicable base offense level is 7, pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2B1.1(a)(1).

    b. The anticipated offense level is increased an additional 12 levels, pursuant to U.S.S.G. § 2B1.1(b)(1)(G), because, as of the date of this plea agreement, the anticipated loss in this case was between $250,000 and $550,000.

    c. This Office does not oppose a 2-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a) based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal

conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional 1-level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

        d.       The parties agree that if the Defendant meets all the criteria set forth in U.S.S.G. § 4C1.1, a further 2-level downward adjustment in the applicable offense level will be appropriate at sentencing.

        7.       There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

        8.       Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Waiver of Appeal

        9.       In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

        a.       The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

        b.       The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows: The Defendant reserves the right to appeal any sentence that exceeds the statutory maximum.

Rev. August 2018

      c.     The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Restitution

10.     The Defendant agrees to the entry of a restitution order for the full amount of the victims' losses, which the parties stipulate is, as of the date of this plea agreement, anticipated to be $847,619.05. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The total amount of restitution shall be due immediately and shall be ordered to be paid forthwith. Any payment schedule imposed by the Court establishes only a minimum obligation. Defendant will make a good faith effort to pay any restitution. Regardless of Defendant's compliance, any payment schedule does not limit the United States' ability to collect additional amounts from Defendant through all available collection remedies at any time. The Defendant further agrees that the Defendant will fully disclose to this Office, the probation officer, and to the Court, subject to the penalty of perjury, all information (including but not limited to copies of all relevant bank and financial records) regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this Agreement, and this Office may seek to be relieved of its obligations under this Agreement.

11.     The parties further acknowledge that in the event of a default or late payment for the bank loan described in the attached Statement of Facts, the Defendant will not oppose a petition to the court for an amended restitution order that includes losses attributable to the loan default.

### Forfeiture

12.     The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense(s), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

13.     Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in any money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities, including a money judgment in the amount of up to approximately $664,936.43, which represents the proceeds the Defendant obtained from the bank fraud conspiracy.

14.     The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding

forfeiture during the change of plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

15. The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

16. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

<u>Defendant's Conduct Prior to Sentencing and Breach</u>

17. Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

18. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

### Court Not a Party

19.    The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

20.    This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Erek L. Barron
United States Attorney

_____
Sean R. Delaney
Assistant United States Attorney

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

1/8/24                                _____
Date                                    Alexander Jacob Schultz

    I am the Defendant's attorney.  I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant.  The Defendant advises me that the Defendant understands and accepts its terms.  To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

| | |
|---|---|
| 1/8/24 | /s/ Andrew Alperstein |
| Date | Andrew Alperstein, Esq. |

# ATTACHMENT A

# STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

## Introduction

From 2018 through 2022, Alexander Jacob Schultz was a fifty percent owner of Limitless Management, LLC ("Limitless Management"), a company that buys, sells, and manages real estate in Maryland. At all times relevant, Schultz's business partner, Person #1, was also a fifty percent owner of Limitless Management. Attorney #1 was an attorney in Towson, Maryland who represented SCHULTZ, Person #1, and Limitless Management on various real estate transactions. As a result of his participation in the bank fraud conspiracy, Schultz obtained, directly or indirectly, an amount up to approximately $664,936.43, and the victims' anticipated losses are at least $847,619.05.

## Coventry Manor Apartment

Coventry Manor was an apartment complex located in Baltimore, Maryland. Coventry Manor was owned by a collection of corporate entities, one of which was called Coventry Realty, LLC, which was controlled by Schultz, Person #1, and others. In or around January 2020 those corporate entities purchased Coventry Manor for $5.5 million. To facilitate the purchase, Coventry Realty LLC received a $4.6 million loan from Bank A. Bank A was a financial institution within the meaning of Title 18, United States Code, Section 20, as its deposits were insured by the Federal Deposit Insurance Corporation ("FDIC"), and it was a member of the Federal Home Loan Bank System. Bank A was headquartered in Richmond, Virginia

In or around March 2021, Coventry Realty, LLC obtained a new loan from Bank B in the approximate amount of $6.2 million for Coventry Manor. The loan from Bank B paid off the original loan issued from Bank A. Bank B was a financial institution within the meaning of Title 18, United States Code, Section 20, as its deposits were insured by the Federal Deposit Insurance Corporation (FDIC), and it was a member of the Federal Home Loan Bank System. Bank B was headquartered in McLean, Virginia. The collective ownership of Coventry Manor by the corporate entities including Coventry Realty, LLC is hereinafter referred to as Coventry Realty.

In or around December 2021, Schultz and Person #1 agreed to sell Coventry Manor to Buyer #1. It was agreed that Buyer #1 would assume the Bank B loan rather than seek new financing. This meant that Buyer #1 would receive the property along with the terms and balance of the Bank B loan. Assumption of a loan commonly requires that the assuming party is qualified under lender or guarantor guidelines. Buyer #1 ultimately assumed the loan as a result of the sale, which has not yet been paid off in full.

Rev. August 2018

10

A Contract of Sale was presented to Bank B reflecting that Buyer #1 would purchase Coventry Manor from Coventry Realty for $7.8 million. Schultz, Person #1, and a representative of Buyer #1 separately entered into an agreement that was not disclosed to Bank B. The agreement, titled, "Agreement to Contract of Sale," was signed by Schultz and the representative of Buyer #1, and stated the true purchase of Coventry Manor was approximately $6.9 million. It further stated that Coventry Realty would provide "seller credits" of approximately $847,619.05 to account for the difference between the fake purchase price of $7.8 million and the actual purchase price of $6.9 million—all of which were material facts that should have been disclosed to Bank B. Attorney #1 prepared both the $7.8 million Contract of Sale and the separate $6.9 million Agreement to Contract of Sale. The difference in the sale price was material to Bank B and knowingly and purposely altered on the contract of sale.

Prior to settlement, it was determined by Schultz and others that only $512,251.12 of the agreed upon seller credits could be reflected on the HUD-1 Settlement Statement as concessions from the seller to the buyer. Among the credits that would be reflected on the HUD-1 Settlement Statement was a fictitious "Reno Credit," in the amount of $85,000 used as mechanism to lower the amount owed by Buyer #1 at closing. Unbeknown to Bank B, Schultz and others agreed that the seller credit deficit of $335,367.93 would be paid to Buyer #1 outside of closing and would not be disclosed to Bank B. The payment outside of closing was material to Bank B and knowingly and purposely omitted from the information provided to Bank B.

On or around April 14, 2022, settlement for the sale of Coventry Manor from Coventry Realty to Buyer #1 was conducted. The executed HUD-1 Settlement Statement reflected a fraudulent sales price of $7.8 million, a fraudulent "Reno Credit," of $85,000 and a "Seller Fee," of $335,367.93 that was to be paid to the law firm at which Attorney #1 was employed. On or about April 14, 2022, a wire transfer was initiated from Settlement Company A to the Attorney Trust Account of Attorney #1 in the amount $351,617.93. The wire transfer details stated that the wire transfer was for Seller Fee/Attorney Fee related to Coventry Manor Apartment.

On or around April 19, 2022, a wire transfer was initiated from the Attorney Trust Account of Attorney #1 to Buyer #1's company. The wire transfer was in the amount of $335,367.93, which was the same amount the parties agreed would be paid outside of closing without Bank B's knowledge, and the same amount reflected on the HUD-1 Settlement Statement as a "Seller Fee," payable to the Attorney #1's law firm.

### Residential Home Wholesale

In addition to purchasing and managing multi-family apartment complexes, Schultz and Person #1 were in the business of wholesaling portfolios of residential homes. Schultz and Person #1 would identify homes being sold for under market value and place contracts on these residences. During the period between the contract ratification and settlement, Schultz and Person #1 would find a third-party buyer to purchase the residential home portfolio at or near market value, thus creating a profit for Schultz and Person #1. The settlements for these transactions usually took place on the same day; therefore, Schultz and Person #1 would own the properties for only a short period of time.

Lender A is a private real estate lender based in New York, New York. Lender #1 mainly provides financing products for real estate investors. In or around September 2021, Schultz and Person #1 identified 42 residential homes near each other in Baltimore, Maryland being sold by various sellers. Schultz and Person #1 negotiated a contract sales price of $87,500 per home or $3,675,000 collectively.

Schultz and Person #1 agreed to sell the 42 residential homes to Buyer #2. The agreed upon purchase price of the properties was $112,500 per home or $4,725,000 collectively. Schultz, Person #1, and Buyer #2 agreed to fraudulently inflate the purchase price to $165,000 per home or $6,930,000 collectively. The purpose of fraudulently inflating the purchase price was to provide Buyer #2 with 100 percent financing from Lender A.

Schultz, Person #1, and Buyer #2 agreed to provide Lender A with the fraudulently inflated purchase price of $165,000 per home or $6,930,000 collectively. Lender A was not told that the true purchase price was $112,500 per home or $4,725,000 collectively. The true purchase price and down payment were material terms to Lender A's loan decision. Buyer #2 was required to provide a down payment of approximately $2 million at closing, however, he did not have funds available. Unbeknown to Lender A, Buyer #2 devised a scheme to produce "show money" that would be provided to the settlement company to satisfy the down payment requirement. Buyer #2 arranged to borrow the funds required from acquaintances. Further, Schultz, Person #1, and Buyer #2 agreed that the $2 million would be returned to Buyer #2 after the closing without the knowledge of the lender or Settlement Company. To complete the scheme, Attorney #1 agreed to receive the $2 million from the Settlement Company into Attorney #1's Attorney Trust Account, then return the funds to the acquaintances from whom Buyer #2 borrowed the funds in order to conceal the source of the $2 million from the settlement company and Lender A.

On or around December 9, 2021, Schultz and Person #1 purchased the 42 residential homes for $3,675,000. Schultz and Person #1 then sold the 42 residential homes to Buyer #1 on the same day for $6,930,000. To fund the purchase of the 42 residential homes, Buyer #1 received two loans from the Lender in the collective amount of $5,236,000. The HUD-1 Settlement Statement reflected that Buyer #2 provided $1,931,545.96 as a down payment and Schultz and Person #1 received $2,921,604.09 from the sale.

On or around December 13, 2021, the Settlement Company wired approximately $2.8 million to Attorney #1's Attorney Trust Account via two wire transfers. The wire transfer details stated that the wire transfer was for, "Seller Proceeds." On the same day, a wire transfer in the amount of $2,024,000 was initiated from Attorney's #1's Attorney Trust Account to a company owned by Buyer #1's acquaintances from which he borrowed the funds for the down payment.

[THIS SPACE INTENTIONALLY LEFT BLANK]

SO STIPULATED:

_____
Sean R. Delaney
Assistant United States Attorney

_____
Alexander Jacob Schultz
Defendant

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including this Factual Stipulation, with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement and Factual Stipulation is an informed and voluntary one.

_____
Andrew Alperstein, Esq.
Counsel for Defendant